IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Verna L. Johnson, Administrator of the Estate of Rex Johnson, | ) ) ) | |
| *Plaintiff,* | ) ) | No. 15 CV 741 |
| *-vs-* | ) ) | *(Judge Guzman)* |
| Sheriff of Cook County, Cook County, Illinois, Quintoria Dunmars, and Dr. Fayez Mekhael | ) ) ) ) | *(Magistrate Judge Gilbert)* |
| *Defendants.* | ) ) | |

## PLAINTIFF'S MOTION TO COMPEL

Plaintiff, by counsel, moves the Court to compel defendant Cook County to produce documents from the Hospital-Wide Quality Assurance Committee and Cermak Health Services Quality Assurance Subcommittee that were prepared in its review of the death of plaintiff's decedent Rex Johnson.

Grounds for this motion are as follows:

1.    Plaintiff's decedent Rex Johnson died of a seizure at the Cook County Jail on November 18, 2013. Plaintiff alleges that his death was caused by the deliberate indifference of the individual defendants and by the policies and practices of defendants Sheriff of Cook County and Cook County.

2.    Plaintiff has requested defendant Cook County to produce:

> All documents from the Hospital-Wide Quality Assurance Committee and Cermak Health Services Quality Assurance Subcommittee that were prepared in review of decedent's case.

(Defendant Cook County's Response to Plaintiff's Requests for Production to all Defendants at 4 ¶ 13, attached as Exhibit 1.)

3.    An explicit policy at the Jail requires that "all deaths are reviewed to determine the appropriateness of clinical care; to ascertain whether changes to policies, procedures, or practices are warranted; and to identify issues that require further study." (Cermak Health Services Policy # A-10 at 1, attached as Exhibit 2.) This review "focuses primarily on systems and processes rather than individual performance." (*Id.*)

4.    In response to plaintiff's request for documents prepared as part of this review, Defendant Cook County objected as follows:

> RESPONSE: The requested documents are privileged as Patient Safety Work Product pursuant to Patient Safety and Quality Improvement Act as well as being privileged under the Illinois Medical Studies Act which privilege should be extended to Plaintiffs federal claim under FRE.

5.    The Illinois Medical Studies Act, 735 ILCS § 8/8-2101, which protects peer review and quality assurance documents in state court, should not protect the documents in a federal court action with federal constitutional claims only. As discussed below, the Illinois statutory privilege has been rejected repeatedly in analogous cases. For similar

-2-

claims of privilege under similar state laws, "nearly every United States district court that has addressed the issue in the context of section 1983 litigation brought on behalf of jail or prison inmates has rejected the assertion of privilege." *Jenkins v. DeKalb Cnty.*, 242 F.R.D. 652, 659 (N.D. Ga. 2007). The single ruling of a circuit court on the issue is in accord. *Agster v. Maricopa County*, 422 F.3d 836 (9th Cir. 2005). In different circumstances, the Supreme Court and circuit courts, included the Seventh, have also rejected application of a similar "peer review" privilege. *Univ. of Penn. v. EEOC*, 493 U.S. 182 (1990); *Adkins v. Christie*, 488 F.3d 1324, 1328-29 (11th Cir. 2007); *Virmani v. Novant Health Inc.*, 259 F.3d 284, 292 (4th Cir. 2001); *Memorial Hosp. for McHenry County v. Shadur*, 664 F.2d 1058, 1063 (7th Cir. 1981).

6.     Federal Rule of Evidence 501 limits the automatic application of state privileges to "a claim or defense for which state law supplies the rule of decision."

7.     The Supreme Court and the Seventh Circuit have made plain that federal courts should not apply state law privileges to federal claims when the state privilege would impose a substantial cost to federal substantive and procedural policy. *Univ. of Penn. v. EEOC*, 493 U.S. 182, 193, 202 (1990) (rejecting proposed common-law privilege that would

-3-

protect records relating to the peer review process in a Title VII action); *Mem'l Hosp. for McHenry County. v. Shadur*, 664 F.2d 1058, 1059 (7th Cir. 1981) (refusing to apply privilege of Illinois Medical Studies Act in federal litigation).

8. Some of the factors that courts consider in determining whether to recognize a privilege were explained by the Seventh Circuit in *Shadur*:

> First, because evidentiary privileges operate to exclude relevant evidence and thereby block the judicial fact-finding function, they are not favored and, where recognized, must be narrowly construed. *United States v. Nixon*, 418 U.S. 683, 710, (1974). Second, in deciding whether the privilege asserted should be recognized, it is important to take into account the particular factual circumstances of the case in which the issue arises. The court should "weigh the need for truth against the importance of the relationship or policy sought to be furthered by the privilege, and the likelihood that recognition of the privilege will in fact protect that relationship in the factual setting of the case." [*Ryan v. Commissioner of Internal Revenue*, 568 F.2d 531, 543 (7th Cir. 1977).]

*Memorial Hosp. for McHenry County v. Shadur*, 664 F.2d 1058, 1061–62 (7th Cir. 1981).

9. Accordingly, district judges have repeatedly rejected the assertion of privilege made by defendant and held that the Illinois Medical Studies Act does not apply in federal civil rights actions. *McLaughlin v. Tilden*, No. 13-CV-1600, 2015 WL 888921, at *2 (C.D. Ill. Feb. 27, 2015); *Levitin v. Nw. Cmty. Hosp.*, No. 13 C 5553, 2014 WL 5510949, at *1 (N.D.

Ill. Oct. 31, 2014); *Dobbey v. Randle*, No. 10 C 3965, 2014 WL 1364428, at *2 (N.D. Ill. Apr. 7, 2014); *Estate of Belbachir v. Cnty. of McHenry*, No. 06C01392, 2007 WL 2128341, at *7 (N.D. Ill. July 25, 2007); *United States v. State of Ill.*, 148 F.R.D. 587, 590–91 (N.D. Ill. 1993); *but see Warren v. Sheriff*, No. 09 CV 3512, 2013 WL 5835771 (N.D. Ill. Oct. 30, 2013).[1]

> 10.   As the Court explained in *McLaughlin*:

> The factors cited in *Shadur* weigh against recognizing a privilege for these types of medical evaluations of treatment and procedures in this case. The treatment of Patrick McLaughlin and the Defendants' procedures are clearly relevant to factual circumstances of the Estate's claim. The Estate contends that the Defendants were responsible for Patrick McLaughlin's death because of those procedures and practices. See Complaint, ¶¶ 15–18. The Documents are relevant to the Court's fact-finding function in this case. As such, a privilege for such documents would impede the search for truth in this case.

*McLaughlin v. Tilden*, No. 13-CV-1600, 2015 WL 888921, at *2 (C.D. Ill. Feb. 27, 2015).

---

[1] Plaintiff respectfully disagrees with Magistrate Judge Kim's conclusion in *Warren*, which goes against the strong weight of precedent. Moreover, in contrast to the plaintiff in *Warren*, plaintiff here has not been provided any information at all about the withheld report or the information used to generate it. *Warren, 2013* WL 5835771, at *3, *4 (referring to affidavit of Report's author and stating that "Plaintiffs have access to every source of information . . . used in generating the Report").

11.   The same factors are present in this case: the treatment of decedent and defendants' procedures are directly relevant to the factual circumstances of the claims.

12.   Just as the Court held in *Estate of Belbachir*, "the information concerning Defendant's policies and practices is critical to Plaintiff's *Monell* claim." *Estate of Belbachir  v. Cnty. of McHenry*, No. 06C01392, 2007 WL 2128341, at *6 (N.D. Ill. July 25, 2007). "While Defendants' express written policies may be easily discovered through the usual discovery channels, the unofficial, defacto practices and customs within the jail are much more difficult to expose." *Id.*

13.   Finally, different considerations apply in this case than in a case against an ordinary hospital:

> Whereas in the ordinary hospital it may be that the first object of all involved in patient care is the welfare of the patient, in the prison context the safety and efficiency of the prison may operate as goals affecting the care offered. In these circumstances, it is peculiarly important that the public have access to the assessment by peers of the care provided. Given the demands for public accountability, which seem likely to guarantee that such reviews take place whether they are privileged or not, we are not convinced by the County's argument that such reviews will cease unless kept confidential by a federal peer review privilege

*Agster v. Maricopa Cnty.*, 422 F.3d 836, 839 (9th Cir. 2005)

14. Defendant also seeks to rely on a federal statute as a source of privilege, the Patient Safety and Quality Improvement Act of 2005, 42 U.S.C. § 299b-21 through § 299b-26.

15. That Act, however, is quite narrow, applying only to documents submitted to a "patient safety organization" for purposes of "patient safety activities." 42 U.S.C. § 299b-21(7)(A); *see Schlegel v. Kaiser Found. Health Plan*, No. CIV 07-0520 MCE KJM, 2008 WL 4570619, at *3 (E.D. Cal. Oct. 14, 2008).

16. The documents in question here are internal documents, (Exhibit 2 at 1, 4); they were not submitted to a "patient safety organization," as defined by the Act. 42 U.S.C. § 299b-24.

17. The fact that the Patient Safety and Quality Improvement Act of 2005 does not protect these documents is further support for plaintiff's position. As the Ninth Circuit explained when considering a different federal statute:

> The Health Care Quality Improvement Act of 1986 granted immunity to participants in medical peer reviews, but did not privilege the report resulting from the process. See 42 U.S.C. §§ 11101–11152. Congress amended the act in 1987 to state that "nothing in this subchapter shall be construed as changing the liabilities or immunities under law or as preempting or overriding any State law." Pub.L. No. 100–177, § 402(c). As Congress has twice had occasion and opportunity to consider the privilege and not granted it either explicitly or by implication, there exists a general objection to our doing so.

*Agster v. Maricopa Cnty.*, 422 F.3d 836, 839 (9th Cir. 2005). When it enacted the Patient Safety and Quality Improvement Act, Congress considered the privilege yet again without applying it.

18. Counsel for plaintiff and for defendant Cook County have communicated by phone on June 18, 2015 and by letter of June 24, 2015, in an attempt to resolve this issue without court intervention. The parties were not able to reach a resolution.

It is therefore respectfully requested that the Court order defendant Cook County to produce the documents from the Hospital-Wide Quality Assurance Committee and Cermak Health Services Quality Assurance Subcommittee that were prepared in review of decedent Rex Johnson's case.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Joel A. Flaxman
JOEL A. FLAXMAN
ARDC NO. 6292818
KENNETH N. FLAXMAN
200 S Michigan Ave Ste 201
Chicago, IL 60604-2430
(312) 427-3200
jaf@kenlaw.com
*Attorneys for Plaintiff*

</div>

**Exhibit 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

VERNA L. JOHNSON, Administrator of )
the Estate of Rex Johnson, )
)
)
*Plaintiff,* )    No. 15-cv-00741
)
-vs- )    *(Judge Guzman)*
)
Sheriff of Cook County, Cook County, )    *(Magistrate Judge Gilbert)*
Illinois, and Quintoria Dunmars, )
)
)
*Defendants.* )

DEFENDANTS' RESPONSE TO PLAINTIFF'S
REQUESTS FOR PRODUCTION TO ALL DEFENDANTS

NOW COME the Defendants, COOK COUNTY and QUINTORIA DUNMARS, by their

attorney, ANITA ALVAREZ, State's Attorney of Cook County, through THOMAS CARGIE,

Assistant State's Attorney, and in response to Plaintiff's Requests for Production to All Defend-

ants, state the following:

1.     All medical records, including but not limited to, electronic medical records, relat-

ing to Rex Johnson from Cermak Health Services or any Cook County Health System facility for

January 1, 2009 through November 30, 2013.

RESPONSE:  See the documents Bates-stamped Johnson/Cook County 001 through 390 that

were produced by Defendants pursuant to FRCP 26(a)(1).

2.     All pharmacy records reflecting any prescriptions written and medication dispensed

to Rex Johnson from November 1, 2013 through November 30, 2013.

RESPONSE:  Defendants have not found any pharmacy records for Johnson's November 2013

detention but the investigation continues.   However, the documents Bates-stamped John-

**Plaintiff's Exhibit 1**                                                                    **Page 1**

son/Cook County 00155-00156 that were produced by Defendant pursuant to FRCP 26(a)(1) show what Dr. Mekhael prescribed for him.

3.    All records of the distributions of any prescription medication to Rex Johnson from November 1, 2013 through November 30, 2013.

RESPONSE: Defendants have not found any pharmacy records for Johnson's November 2013 detention but the investigation continues. The nursing note from November 17, 2013 that was Bates Stamped Johnson/Cook County 00164 shows that he received Metoprolol from "doctors" "KOP." KOP means "Keep On Person" which is medication given to the inmate for self-administration.

4.    All records reflecting the scheduling and treatment of Rex Johnson for medical care from November 1, 2013 through November 30, 2013. This request includes, but is not limited to, any Off Site Notification Patient Preparation and Return Forms, records maintained by the Cermak Office of Patient Scheduling, and any handwritten (or computer) logs maintained by the Sheriff or Cermak Health Services employees reflecting Rodgers being moved to (and from) Cermak Health Services.

RESPONSE: Objection. This request is over broad, irrelevant and unduly burdensome. Without waiving those objections, see document Bates Stamped Johnson/Cook County 00391. Investigation continues.

5.    The personnel file, any complaints, reports of discipline, or other employment-related material of Quintoria Dunmars.

RESPONSE: Objection. This request is over broad, irrelevant and unduly burdensome. Without waiving those objections, the investigation continues.

2

**Plaintiff's Exhibit 1**                                                        **Page 2**

6. The personnel file, any complaints, reports of discipline, or other employment-related material of Ulysses Johnson.

RESPONSE: Objection. This request is over broad, irrelevant and unduly burdensome. Without waiving those objections, the investigation continues.

7. All documents stating the policy and/or procedures for medical intake at the Jail for the period January 1, 2010 to the present.

RESPONSE: Objection. This request is over broad, irrelevant and unduly burdensome. Without waiving those objections, see document Bates Stamped Johnson/Cook County 00392-457. Investigation continues.

8. All documents stating the policy and/or procedures for treating detainees using prescription drugs at the Jail for the period January 1, 2010 to the present.

RESPONSE: Objection. This request is over broad, irrelevant and unduly burdensome. Without waiving those objections, see document Bates Stamped Johnson/Cook County 00458-498. Investigation continues.

9. All documents stating the policy and/or procedure for dispensing medication to prisoners at the Cook County Jail for the period January 1, 2010 to the present.

RESPONSE: See Answer to Request #8.

10. All documents stating the policy and/or procedures for maintaining complete, accurate, and accessible medical records at the Cook County Jail for the period January 1, 2010 to the present.

RESPONSE: Objection. This request is over broad, irrelevant and unduly burdensome. Without waiving those objections, see document Bates Stamped Johnson/Cook County 00499-500. Investigation continues.

3

11.    All documents stating the policy and/or procedure relating to a death of a Cook County Jail prisoner for the period January 1, 2010 to the present. This request includes, but is not limited to, any reports to any internal or external agency relating to a prisoner death.

RESPONSE:  Objection. This request is over broad, irrelevant and unduly burdensome.  Without waiving those objections, see document Bates Stamped Johnson/Cook County 00501-513.  Investigation continues.

12.    All reports, photographs, notes, or other documents related to any investigation or review of the death of plaintiff's decedent. This request includes, but is not limited to material related to any investigation or review by Investigator Raher #193 or Medical Examiner Mr. Earl Briggs #76. *See* JOHNSON 15 C 741 – 00002 – (Sheriff's Document). It also includes, but is not limited to, the photographs referred to in the notation, "CRIME SCEEN CAPTURED ON SD CARD#15." *Id.* Under Rule 34(b)(1)(c), Plaintiff requests that all photographs or images be produced electronically in JPEG format on a disc.

RESPONSE:  Defendants have already produced the Medical Examiner's report.  The other documents requested are not in the custody of the County Defendants.

13.    All documents from the Hospital-Wide Quality Assurance Committee and Cermak Health Services Quality Assurance Subcommittee that were prepared in review of Rex Johnson's case.

RESPONSE:  The requested documents are privileged as Patient Safety Work Product pursuant to Patient Safety and Quality Improvement Act as well as being privileged under the Illinois Medical Studies Act which privilege should be extended to Plaintiff's federal claim under FRE 501.

4

**Plaintiff's Exhibit 1**                                   **Page 4**

Respectfully Submitted,

ANITA ALVAREZ
State's Attorney of Cook County

By:     /s/ Thomas Cargie
        Thomas Cargie
        Assistant State's Attorney

Thomas Cargie
Assistant State's Attorney
Conflicts Counsel Unit
69 W. Washington St. STE 2030
Chicago, Il 60602
(312) 603-1426

## CERTIFICATE OF SERVICE

I, Thomas Cargie, Assistant State's Attorney, hereby certify that I served a copy of these DEFENDANTS RESPONSE TO PLAINTIFF'S REQUESTS FOR PRODUCTION on the below listed by depositing the same in the United States mail, postage prepaid, at 69 West Washington Street, Chicago, Illinois 60602, before 5:00 p.m. on June 15, 2015.

/s/Thomas Cargie
Thomas Cargie

Representing Plaintiff
Kenneth N Flaxman
Joel Flaxman
Kenneth N. Flaxman, P.C.
200 South Michigan Avenue
Suite 201
Chicago, IL 60604-6107
(312) 427-3200
Email: knf@kenlaw.com

Representing Defendant Sheriff
Nicholas Cummings
Cook County State's Attorney's Office (50 W)
50 West Washington Avenue
Chicago, IL 60602
(312) 603-3124
Email: Nicholas.cummings@cookcountyil.gov

5

**Exhibit 2**

| COOK COUNTY HEALTH<br>& HOSPITALS SYSTEM<br>**CCHHS** | Category:<br>**Cermak Health Services** | |
|---|---|---|
| Subject:<br>Governance and Administration | Page<br>1 of 6 | Policy #:<br>A-10 |
| Title:<br>MORTALITY REVIEW | Approval Date:<br>June 9, 2011 | Posting Date:<br>June 15, 2011 |

## PURPOSE

The purpose of this policy is to ensure all deaths are reviewed to determine the appropriateness of clinical care; to ascertain whether changes to policies, procedures, or practices are warranted; and to identify issues that require further study.

## AFFECTED AREAS

This policy impacts all areas of Cermak Health Services and Cook County Jail.

## POLICY

As part of its ongoing patient safety and quality improvement system, Cermak Health Services will review all inmate mortality and serious morbidity. Morbidity and mortality review focuses primarily on systems and processes rather than individual performance, but does include analysis of human factors. The principal goal of this review is to ascertain whether process improvements are needed in order to improve the quality of care and to reduce the likelihood of morbidity and mortality in the future.

Any death that is unanticipated and not related to the natural course of the patient's illness or underlying condition will be classified as a sentinel event and will trigger a root cause analysis with the mortality review; see Cermak Policy A-06.1.

Corrective actions identified through the mortality review process are implemented and monitored by the QI Committee. The morbidity and mortality review is a self-evaluative and self-critical analysis conducted by the Mortality Review Committee on behalf of the Quality Improvement (QI) Committee for the purpose of internal quality improvement. Mortality reviews are confidential and privileged as patient safety work product.

CONFIDENTIALITY: Reports of mortality reviews and their addenda, including all information, interviews, reports, statements, memoranda or other data used in the course of internal quality control, medical study, for the purpose of reducing morbidity or mortality, or for improving patient care, shall be privileged and strictly confidential. All evaluations and improvement activities are conducted for the purpose of quality assessment and control; the improvement of patient care and medical study; and for the reduction of morbidity and mortality. Such activities are conducted with the intent that they remain confidential and in reliance upon the privilege attached to these activities as set forth in the Illinois Medical Studies Act. All employees shall observe the prohibitions on disclosure of this information.

## DEFINITIONS

*Serious suicide attempt* – a suicide attempt that is considered to be either potentially life-threatening or that required medical treatment for serious harm.

*Perinatal death* – death of a fetus or neonate that occurs during late pregnancy (at or beyond 22 completed weeks gestation), during childbirth, or up to seven completed days of life.

JOHNSON/ COOK COUNTY 00501

| Title: MORTALITY REVIEW | Page 2 of 6 | Policy # A-10 |
|---|---|---|

## PROCEDURE/PROCESS

### A. The Mortality Review Committee.

This committee has representation from the following disciplines: correctional medicine (at least two internists and/or family practice physicians), administration, mental health (a psychiatrist, a clinical psychologist, and a non-doctoral mental health worker), patient care services (at least one nurse and one correctional medical technician), quality improvement, CCDOC and medical advocacy. The chief medical officer (CMO) appoints the chair. The committee will review these events:

- Mortality
    - An inmate within the compound of the Cook County Department of Corrections;
    - An inmate in the custody of the Sheriff of Cook County at any outside hospital;
    - An inmate who had been released from the custody of the Sheriff at any outside hospital, if death occurred before hospital discharge;
    - For perinatal death, the offspring of a female inmate in the custody of the Sheriff of Cook County.
- Morbidity without mortality
    - Any incident in which an inmate was at high risk of death due to an illness or injury that occurred while in custody;
    - Any serious suicide attempt.

The committee will not review an event if the inmate, although in the Sheriff's custody, never entered the CCDOC compound between the time of arrest and the time of death.

### B. Review Process

1. *The medical officer of the day and/or External Operations of CCDOC* notifies the medical director at the time of any inmate death. The CMO, in turn, will immediately notify the chief Operating Officer (COO).
2. *CCDOC:*
    a. Notifies the Office of the Medical Examiner to pick up the body;
    b. Delivers the death packet to the CMO.
3. *The CMO or the COO* designates the death as a sentinel event if it meets the definition above. If so, then Cermak Policy A-06.1 applies, in addition to this policy.
4. *The CMO or associate medical director:*
    a. Notifies the chair of the Mortality Review Committee and the chair of the QI Committee;
    b. Coordinates with correctional authorities to gather information soon after the death including an interagency critical incident review with CCDOC.
    c. Obtains the following materials from CCDOC as they become available and forwards them to the chair of the Mortality Review Committee:
        - Death packet (in all cases; from External Operations or from CCDOC Records)
        - Critical Incident Report (in cases designated as such; from divisional superintendent);
        - Offense/Incident Report (in cases where suicide or homicide is considered possible; from Criminal Intelligence Unit (CIU) of the Sheriff's Police Department

**Plaintiff's Exhibit 2**

| Title:<br>MORTALITY REVIEW | Page<br>3 of 6 | Policy #<br>A-10 |
|---|---|---|

    d.  Contacts the Office of the Medical Examiner for clinic-pathological correlation and for the preliminary cause of death.

5.  *The Chair of the Mortality Review Committee:*
    a.  Appoints a physician member to review the death;
    b.  Notifies the *Director of Health Information Management Department (*HIMD) of the patient death and the designated reviewer.

6.  *The director of* HIMD or designee assembles the health record and delivers a copy to the designated reviewer, COO, CMO and Risk Manager.

7.  *The reviewer* will:
    a.  If the death is a sentinel event: participate in the team conducting a root cause analysis; *OR* If the death is not a sentinel event: use a conceptual framework similar to that for root cause analysis; review records, interview staff who provided care, and confer with fellow members of the Mortality Committee; submit the review to the committee chair within 10 days of assignment.
    b.  Establish and document the facts of the case in terms of:
        –  Circumstances surrounding the incident;
        –  Policies and procedures relevant to the incident;
        –  Prior training relevant to the incident received by involved staff;
        –  Pertinent medical and mental health services received by the victim;
        –  Possible precipitating factors of any kind leading to the incident.
    c.  Perform a critical analysis of the above information and be prepared to comment in terms of the same categories used for a root cause analysis (see Cermak Policy A-06.1).

8.  *The Chair of the Mortality Committee* distributes the review to members and schedules a date to meet.

9.  *The Mortality Review Committee* will within 21 days of the death, meet, discuss the review, and formulate recommendations for any necessary action in terms of:
    a.  Changes in scope of services, operational policies and procedures, staff training, physical plant, supplies and equipment, etc.
    b.  Further study of specific issues, if needed.

10. *The Chair of the Mortality Committee* will within 30 days of the death:
    a.  Prepares the Mortality Review Report, consisting of the review together with the recommendations from the Mortality Review Committee, with the header and footer shown below on every page.
    b.  Forwards the Mortality Review Report, marked CONFIDENTIAL, to the COO, the Deputy COO, the CMO, and the Quality Improvement File.
    c.  Delivers the original health record, death packet, and Mortality Report to the director of HIM.

11. *The Director of HIMD* designee archives these documents together in two formats:
    a.  Original hard copy in a secured office within the HIMD, accessible only to the Director or designee.
    b.  Scanned electronic copy in a shared secure folder on the network drive, accessible only to the following persons: COO, Deputy COO, CMO, Associate Medical Director, Director of HIMD, Director of Quality Improvement and Risk Manager. The folder is named LastName_FirstName_Death and the files are named LastName_FirstName_Chart, LastName_FirstName_Packet, LastName_FirstName_Report,

12. *The COO and/or CMO* inform staff of the recommendations and any process improvements to be implemented.

JOHNSON/ COOK COUNTY 00503

| Title:<br>MORTALITY REVIEW | Page<br>4 of 6 | Policy #<br>A-10 |
|---|---|---|

13. *The Chair of the Mortality Committee:*
    a.  Reviews autopsy findings upon receipt; writes an addendum to the mortality review report if indicated;
      b.  Forwards autopsy findings and any addendum to the director of HIMD to be appended to existing files.

### C. Formats for the Mortality Review and the Mortality Review Report

The mortality review process produces two documents: the mortality review and the mortality review report. The mortality review, prepared by the designated reviewer, contains the facts of the case. The mortality review report, prepared by the chair of the mortality review committee, includes the mortality review plus recommendations from the Mortality Review Committee.

**Format – Mortality Review.** The mortality review includes each of the following sections:
1. *Title/header:* The mortality review is titled "Mortality Review – Patient Safety and Quality Improvement." Each subsequent page of the report includes this title in the header.
2. *Preamble/footer:* The report begins with the paragraph below. Each subsequent page of the report includes this confidentiality statement in the footer.

> This mortality review has been prepared as part of the patient safety and quality improvement system at Cermak Health Services, which includes a self-evaluative and self-critical analysis of mortality cases in order to identify potential improvements in the quality of health care and thereby to decrease the likelihood of similar occurrences in the future. This document and its contents are confidential and privileged as patient safety work-product for the purpose of internal quality improvement.

3. *Identifying information:* Name; inmate and booking numbers; dates of birth, booking, and death.
4. *Cause of death:* List medical examiner's preliminary or final cause.
5. *Sources:* Listing of documents and other information sources used in preparing the review.
6. *Facts of the case:* Presentation and course; preliminary autopsy report; psychological autopsy for suicides. Chronologic detailing of clinically relevant findings (including pertinent negatives) and ssessment or working diagnosis as it evolved in the case
7. *Supporting documents:* Include each of the following documents; if one is pending or will not be created, note the reason for its absence on a separate page:
    a.  Final autopsy report (after completion by Office of the Medical Examiner)
    b.  Death packet from CCDOC (in all cases)
    c.  Critical Incident Report from CCDOC (in cases designated as such);
    d.  Offense/Incident Report from CIU (in cases where suicide or homicide is considered)
    e.  Other supporting documents

### D. Action After Completion of Report

1. The CMO chair of the Mortality Committee will forward report to the Director of Quality Improvement.
2. The QI Committee will ensure implementation of recommended changes.

JOHNSON/COOK COUNTY 00504

| Title:<br>MORTALITY REVIEW | Page<br>5 of 6 | Policy #<br>A-10 |
|---|---|---|

**Format – Mortality Review Report.** The mortality review report includes the sections listed below. Each section must start on a separate page.

1. *Cover page:*

<div align="center">

Cermak Health Services of Cook County<br>
Mortality Review Committee<br>
Mortality Review Report

[insert identifying information as listed in the Mortality Review]

</div>

> This mortality review has been prepared as part of the patient safety and quality improvement system at Cermak Health Services, which includes a self-evaluative and self-critical analysis of mortality cases in order to identify potential improvements in the quality of health care and thereby to decrease the likelihood of similar occurrences in the future. This document and its contents are confidential and privileged as patient safety work-product for the purpose of internal quality improvement.

2. *Review:* The mortality review is included in full except for the supporting documents, which are omitted. It includes the text from the cover page on each of its pages.
3. *Recommendations:* This is the portion of the report that contains self-evaluative, self-critical analysis, based upon the review and other information gathered in the course of preparing the review. It includes the text from the cover page on each of its pages. It consists of:
   a. Identification of any contributing systemic causes, if any
   b. Consideration of potential process improvements that may improve the quality of care and reduce the likelihood of morbidity and mortality in the future.
   c. Identification of issues that warrant further study, if any.
   d. Citations from pertinent medical literature (optional).

## SELF-MONITORING OF COMPLIANCE INDICATORS

The COO and CMO will monitor the quality and timeliness of death reviews and reports.

## CROSS REFERENCES

| NCCHC Standards addressed by this policy | A-10 |
|---|---|
| Pertinent ACA Standards | 4-ALDF-4D-23 |
| Cermak policy number in last revision | 01-08A-12 (19-A-10) |
| Revision dates of all previous versions | 6/2006, 1/2003, 12/1986 |
| Date of last review, if later than last revision | n/a |
| Other related Cermak policies | A-06.1 |
| Pertinent system-wide CCHHS policies | n/a |
| Pertinent custody directives | G.O. 1.19 & 1.19A; G.O. 12.10<br>External Operations Policy #32, Hospital Policy & Procedure |

JOHNSON/COOK COUNTY 00505

| Title: | Page | Policy # |
|---|---|---|
| MORTALITY REVIEW | 6 of 6 | A-10 |

**POLICY UPDATE SCHEDULE**
To be reviewed no later than 1 year after posting date.

**POLICY LEAD**

Avery Hart, MD
Chief Medical Officer

**REVIEWER(S)**

Quality Improvement Committee
Ronald Shansky, MD, DOJ Monitor

**APPROVAL PARTY(IES)**

Michael Puisis, DO
Chief Operating Officer

Avery Hart, MD
Chief Medical Officer

REVIEW HISTORY
Written: December 15, 2010
Revised: June 6, 2011

JOHNSON/COOK COUNTY 00506