IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VERNA L. JOHNSON, Administrator of the Estate of Rex Johnson, | )<br>)<br>) |
| Plaintiff, | ) No. 15 C 741<br>) |
| v. | ) Magistrate Judge<br>) Jeffrey T. Gilbert |
| COOK COUNTY, et al., | )<br>) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff Verna L. Johnson's ("Plaintiff's") Motion to Compel (ECF No. 36) production of the Mortality & Morbidity Report ("Report") prepared following the November 18, 2013 death of Plaintiff's decedent, Rex Johnson, while Mr. Johnson was detained at Cook County Jail ("Jail"). Defendant Cook County ("Defendant") asserts the Report is privileged under state law pursuant to the Illinois Medical Studies Act ("IMSA"), 735 ILCS 5/8-2101, *et seq.*, and federal law pursuant to the Patient Safety and Quality Improvement Act of 2005 ("PSQIA"), 42 U.S.C. §§ 299b-21, *et seq.* For the reasons set forth below, the Court holds that Defendant has not met its burden of establishing the Report is privileged under either statute. Plaintiff's Motion to Compel therefore is granted.

## BACKGROUND

Plaintiff brings this action under 42 U.S.C. § 1983 for alleged constitutional violations related to Mr. Johnson's death while he was detained at the Jail in November 2013. Specifically, Plaintiff alleges that various systemic failures in intake medical screening at the Jail and a deliberate indifference to Mr. Johnson's medical needs caused his death. ECF No. 27.

According to the Amended Complaint, Mr. Johnson was detained at the Jail on three separate occasions prior to the November 2013 detention at issue in this case: August to September 2008, October to November 2009, and August 2013. *Id.* at 2-3. Jail personnel conducted an intake medical screening of Mr. Johnson as part of each of those three detentions. *Id.* The personnel conducting the medical screenings memorialized in Mr. Johnson's medical records that he required a variety of prescription medications for serious medical needs, including hypertension and seizure disorder. *Id.*

Mr. Johnson was again detained at the Jail from November 14, 2013 until his death on November 18, 2013. As with his prior detentions, Mr. Johnson underwent an intake medical screening by Jail personnel shortly after his arrival. *Id.* at 3. Mr. Johnson was first assessed by a "correctional medical technician," who referred him to an "emergency response technician" for a secondary assessment. *Id.* The "emergency response technician" determined Mr. Johnson had a history of seizures. *Id.* at 4. A physician then examined Mr. Johnson. *Id.* The physician reviewed the medical records on file, which documented Mr. Johnson's history of seizures and showed that Mr. Johnson required and received seizure medication during his three previous detentions at the Jail. *Id.* at 4-5. Despite Mr. Johnson's medical history, however, the physician did not prescribe any seizure medication for Mr. Johnson, and Mr. Johnson did not otherwise receive any seizure medication at any point during the November 2013 detention. *Id.* at 5.

On the evening of November 17, 2013, Mr. Johnson complained to a correctional officer that he had vomited ten times since lunch. *Id.* at 7. The correctional officer escorted Mr. Johnson to the Jail nurse, who reviewed Mr. Johnson's medical records and saw he was not receiving any medication for his seizure disorder. *Id.* at 7-8. Rather than providing Mr. Johnson with the necessary seizure medication, the nurse instead provided him with an over-the-counter

2

medication for an upset stomach. *Id.* at 8. Mr. Johnson returned to his cell shortly thereafter, where he suffered a seizure and died. *Id.*

Pursuant to Jail policy, personnel of Cermak Health Services, the entity responsible for providing medical care to inmates at the Jail, conducted a morbidity and mortality review of Mr. Johnson's death. The findings and recommendations of the morbidity and mortality review are memorialized in the Report prepared after Mr. Johnson's death. Plaintiff now seeks to compel production of that Report.

## DISCUSSION

Defendant asserts the Report is privileged both as a matter of state law under the IMSA and federal law under the PSQIA. As the party seeking to invoke a privilege, Defendant has the burden of showing that it applies. *Valero Energy Corp. v. United States*, 569 F.3d 626, 630 (7th Cir. 2009). The Court has reviewed the Report *in camera* and finds that Defendant has not met its burden of establishing that either statutory privilege applies.

### A. IMSA Privilege

Defendant first asserts the Report is privileged as a matter of state law under the IMSA, which creates a privilege for certain information created by or for the use of a health care peer review committee engaged in internal quality control measures. *See* 735 ILCS 5/8-2101, *et seq.* The IMSA provides, in relevant part:

> All information, interviews, reports, statements, memoranda, recommendations, letters of reference or other third party confidential assessments of a health care practitioner's professional competence, or other data of . . . committees of licensed or accredited hospitals or their medical staffs, including Patient Care Audit Committees [and] Medical Care Evaluation Committees . . . used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care or increasing organ and tissue donation, shall be privileged, strictly confidential and shall be used only for medical research, increasing organ and tissue donation, the evaluation

3

and improvement of quality care, or granting, limiting or revoking staff privileges or agreements for services . . . .

735 ILCS 5/8-2101. The IMSA further provides that any such information "shall not be admissible as evidence, nor discoverable in any action of any kind in any court or before any tribunal, board, agency or person." 735 ILCS 5/8-2102.

The purpose of the IMSA is to "ensure that members of the medical profession will effectively engage in self-evaluation of their peers in the interest of advancing the quality of health care." *Roach v. Springfield Clinic*, 623 N.E.2d 246, 251, 157 Ill. 2d 29, 40 (1993). The statute is premised on the belief that, absent the privilege, "physicians would be reluctant to sit on peer-review committees and engage in frank evaluations of their colleagues." *Id.* (citing *Richter v. Diamond,* 108 Ill. 2d 265, 269, 483 N.E.2d 1256, 1258 (1985)).

Despite the statute's broad language, Illinois courts have made clear that the IMSA does not bestow a privilege on all information used for internal quality control. *Grandi v. Shah*, 261 Ill. App. 3d 551, 557, 633 N.E.2d 894, 899 (2d Dist. 1994); *see also Roach*, 623 N.E.2d at 251 (noting the IMSA "was never intended to shield hospitals from potential liability"). The wealth of case law interpreting the statue has significantly narrowed the scope of the privilege. It is unnecessary to delve further into this issue, however, because Plaintiff does not argue that the Report does not fall within the scope of the peer review privilege created by the IMSA.

The real issue here is whether the IMSA privilege should apply in federal court, where the Federal Rules of Civil Procedure, and not state law, govern discovery. Federal Rule of Civil Procedure 26(b)(1) provides that a party may discover any relevant, nonprivileged matter. FED. R. CIV. P. 26(b)(1). Rule 501 of the Federal Rules of Evidence provides the framework for determining whether material sought in discovery is privileged. Under Rule 501, where state law supplies the rule of decision, state law also governs privilege. FED. R. EVID. 501. But when a

4

case is based on a federal cause of action, "the common law – as interpreted by the United States courts in the light of reason and experience – governs a claim of privilege." *Id.* Thus, because Plaintiff asserts a federal claim under Section 1983, the Court is not obliged to apply the IMSA privilege. *See Memorial Hosp. for McHenry County v. Shadur*, 664 F.2d 1058, 1061 ("Because state law does not supply the rule of decision as to this claim, the district court was not required to apply state law in determining whether the material sought . . . is privileged.").

That does not mean, however, that the Court should not consider the state law privilege in the context of this federal claim. As the Seventh Circuit has pointed out, a "strong policy of comity between state and federal sovereignties impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy." *Id.* (internal citations and quotations omitted). The Seventh Circuit has identified two fundamental principles the district court should keep in mind when determining whether a state law privilege should apply in federal proceedings based on a federal cause of action. "First, because evidentiary privileges operate to exclude the relevant evidence and thereby block the judicial fact-finding function, they are not favored and, where recognized, must be narrowly construed." *Id.* (internal citation omitted). Second, "the court should weigh the need for truth against the importance of the relationship or policy sought to be furthered by the privilege, and the likelihood that recognition of the privilege will in fact protect that relationship in the factual setting of the case." *Id.* at 1061-62 (internal citations and quotations omitted). With that background in mind, the Court turns to the facts of this case.

The Report Plaintiff seeks is directly relevant to the subject matter of his federal claim. According to the complaint, a litany of systemic failures and a widespread practice of deliberate indifference at the Jail caused Mr. Johnson's death. ECF No. 27 at 5. Jail Policy A-10

("Policy") explicitly states that morbidity and mortality reviews and reports focus on the issue of systemic failures. See ECF No. 36-2 at 1 (stating the review "focuses primarily on systems and processes rather than individual performance," with the "principal goal of [ascertaining] whether process improvements are needed in order to improve the quality of care and to reduce the likelihood of morbidity and mortality in the future"). The Policy further states that any morbidity and mortality report, such as the Report at issue here, must contain recommendations identifying "any contributing systemic causes" and "consideration of potential process improvements that may improve the quality of care and reduce the likelihood of morbidity and mortality in the future." *Id.* at 5. Stated simply, the Policy dictates that the Jail's morbidity and mortality reports focus precisely on the type of concerns that are at issue in this case.

Defendant argues that all of the information used to complete the Report already has been produced to Plaintiff and, therefore, applying the privilege "would not result in denying any relevant evidence to Plaintiff." ECF No. 39 at 3. The fact that Defendant has produced the underlying documents does not undercut the relevance of the Report to Plaintiff's claim. The Court's *in camera* review of the Report confirms it comports with the Policy's requirement that morbidity and mortality reviews are to focus primarily on "systems and processes." The factual information and conclusions contained in the Report may prove critical to Plaintiff's Section 1983 claim, which will require Plaintiff to show that widespread but unofficial Jail practices or policies led to Mr. Johnson's death. As set forth below in greater detail, that often proves difficult in cases such as this one, where an institution's official policies and procedures are easy to come by, but its *de facto* practices are much more difficult to discover. The need for truth, then, weighs in Plaintiff's favor.

6

Additionally, Defendant has not met its burden in showing how "the importance of the relationship or policy sought to be furthered by the privilege" would be protected by recognizing the privilege here. *Shadur*, 664 F.2d at 1061-62. As noted above, the purpose behind the IMSA privilege is to "ensure that members of the medical profession will effectively engage in self-evaluation of their peers in the interest of advancing the quality of health care." *Roach*, 623 N.E.2d at 251. The Seventh Circuit has acknowledged the importance of that policy, noting that "[c]onstructive professional criticism cannot occur in an atmosphere of apprehension that one doctor's suggestion will be used as a denunciation of a colleague's conduct in a malpractice suit." *Shadur*, 664 F.2d at 1062 (internal quotations and citations omitted). But the Seventh Circuit also has emphasized that the policy is at its strongest in a medical malpractice suit, where the crucial issue is whether a defendant was negligent in his care and treatment of a plaintiff, and where recognizing the privilege "will generally have little impact upon the plaintiff's ability to prove a meritorious claim." *Id.*

Plaintiff is not alleging medical malpractice. Plaintiff instead is alleging that systemic failures in the Jail's intake medical screening process, and a widespread practice of deliberate indifference to the serious medical needs of inmates, led to Mr. Johnson's death. Multiple courts have noted that this question is entirely separate from tort liability in a medical malpractice suit, and often harder for a plaintiff to prove. For example, as the Ninth Circuit Court of Appeals noted:

> Whereas in the ordinary hospital it may be that the first object of all involved in patient care is the welfare of the patient, in the prison context the safety and efficiency of the prison may operate as goals affecting the care offered. In these circumstances, it is peculiarly important that the public have access to the assessment by peers of the care provided.

7

*Agster v. Maricopa Cnty.*, 422 F.3d 836, 839 (9th Cir. 2005). In *Jenkins v. DeKalb County*, 242 F.R.D. 652 (N.D. Ga. 2007), the district court pointed out that

> [t]here are unique considerations at play in a post-death investigation ordered by a county jail that dramatically weaken the case for recognizing [a peer review] privilege. A review of a deceased inmate is not the straightforward evaluation of medical care that occurs in the civilian context. The generation of post-death reports . . . may include details such as when jail officials notified medical officials of a particular problem, and whether there was a reason for non-medical officials to have monitored a situation more closely. The report may verify the fact that a jail official failed to notify medical personnel. Not only is this type of information "nonmedical," but it [ ] also may shed light, or at least raise an inference, of jail customs or policies.

*Id.* at 8. Courts in this district have agreed with this reasoning. *See, e.g., Estate of Belbachir v. County of McHenry*, 2007 WL 2128341, at *7 (N.D. Ill. Jul. 25, 2007) ("In a civil rights case such as this one, evidence of unconstitutional policies and customs may not exist outside of the confines of a post-death consultation of jail personnel.").

Moreover, the Report's stated purpose is not the type of performance evaluation the IMSA envisions to be privileged. The IMSA peer review privilege responds to medical errors resulting from a particular practitioner's actions, as evidenced by the statute's goal of encouraging "frank evaluations of [ ] colleagues." *Roach*, 623 N.E.2d at 251. But the Report, by the Policy's own admission, "focuses primarily on systems and processes rather than individual performance." ECF No. 36-2 at 1. Thus, to the extent Defendant is concerned that disclosure of the Report will have a chilling effect on candid peer assessments of medical professionals, that concern is misplaced. The Jail's morbidity and mortality review process does not focus on individual performance and critique thereof. In any event, "[g]iven the demands for public accountability [in cases involving the death of an inmate], which seem likely to guarantee that such reviews take place whether they are privileged or not, we are not convinced by the County's

8

argument that such reviews will cease unless kept confidential by a federal peer review privilege." *Agster*, 422 F.3d at 839.

To the extent the remote risk of a chilling effect does exist, it does not outweigh the constitutional concerns at issue here. Plaintiff is alleging that various constitutional violations led to the death of an inmate, whose safety and well-being were the responsibility of the state. Congress enacted Section 1983 to provide a vehicle for plaintiffs to address precisely this type of concern. *See Belbachir*, 2007 WL 2128341 at *6 (by enacting Section 1983, "Congress used the power of the Fourteenth Amendment to set aside concerns over state sovereignty and authorize the federal courts to vindicate deprivations of liberty carried out under color of state law"). That is perhaps why "nearly every United States district court that has addressed the issue in the context of section 1983 litigation brought on behalf of jail or prison inmates has rejected the assertion of [a peer review] privilege." *Jenkins*, 242 F.R.D. at 659. Should the Court recognize the Illinois peer review privilege here, it would come at a substantial cost to federal policy. The Court declines to extend the IMSA privilege to this federal cause of action.

## B. PSQIA Privilege

Defendant next asserts that, even if the IMSA privilege does not apply in this proceeding, the Report is nevertheless privileged under federal law pursuant to the PSQIA. Congress enacted the PSQIA following a 1999 report by the Institute of Medicine which found that as many as 98,000 people in United States hospitals die each year as a result of preventable medical errors. 73 Fed. Reg. 8112, 8112-13 (Feb. 12, 2008). The PSQIA was designed to promote a learning environment that moved "beyond the existing culture of blame and punishment that suppresses information about health care errors to a 'culture of safety' that focuses on information sharing,

improved patient safety and quality and the prevention of future medical errors." S. Rep. No. 108-196, at 2 (2003). As set out in a 2005 House of Representatives report:

> The [PSQIA's] intended purpose is to encourage the reporting and analysis of medical errors and health care systems by providing peer review protection of information reported to patient safety organizations for the purposes of quality improvement and patient safety. These protections will facilitate an environment in which health care providers are able to discuss errors openly and learn from them.

H.R. REP. NO. 109-197, at 9 (2005). To that end, the PSQIA affords a privilege to all documents, communications, and other information that meet the statutory definition of "patient safety work product." 42 U.S.C. § 299b-22. Information that does not meet the definition is not privileged under the PSQIA, and the parties do not dispute that point. Instead, the parties disagree as to whether the Report is the type of document that may be considered "patient safety work product" under the statute. Resolution of the parties' dispute, then, turns on what qualifies as patient safety work product.

To answer that question, the Court turns to the text of the PSQIA, the starting point in any case involving questions of statutory construction. *Turley v. Gaetz*, 625 F.3d 1005, 1008 (7th Cir. 2010) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.") (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)). The PSQIA defines "patient safety work product," in relevant part, as

> any data, reports, records, memoranda, analyses (such as root cause analyses), or written or oral statements–
> (i) which–
>   (I) are assembled or developed by a provider for reporting to a patient safety organization and are reported to a patient safety organization; or (. . .)
> (ii) which identify or constitute the deliberations or analysis of, or identify the fact of reporting pursuant to, a patient safety evaluation system.

10

42 U.S.C. § 299b-21(7)(A).

A patient safety organization ("PSO") is "a private or public entity or component thereof that is listed by the Secretary [of Health and Human Services] [as a qualifying entity]." 42 U.S.C. § 299b-21(4). All PSOs must meet and maintain certain criteria, discussed below in more detail, to become and remain listed as a certified PSO in the Secretary's database. 42 U.S.C. § 299b-24. The Secretary may revoke an entity's PSO certification if the entity fails to meet these criteria. 42 U.S.C. § 299b-24(e). A patient safety evaluation system is "the collection, management, or analysis of information for reporting to or by a patient safety organization." 42 U.S.C. § 299b-21(6).

While the PSQIA announces broad evidentiary protections for patient safety work product, its drafters made clear that the statue was not intended to provide a blanket protection for all information and communications generated for quality control purposes. *See* S. Rep. No. 108-196, at 2 (2003) (explaining the protections apply only to "certain categories of documents and communications termed 'patient safety work product' that are developed in connection with newly created patient safety organizations"). The text of the PSQIA manifests the drafters' intent by emphasizing that only information specifically made or gathered for or by a patient safety organization ("PSO") or a patient safety evaluation system is patient safety work product. 42 U.S.C. § 299b-21(7)(A). The statute elaborates on that point by stressing that patient safety work product "does not include information that is collected, maintained, or developed separately, or exists separately, from a patient safety evaluation system. Such separate information or a copy thereof reported to a patient safety organization shall not by reason of its reporting be considered patient safety work product." 42 U.S.C. § 299-b21(7)(B).

11

Turning to the facts of this case, the Court finds that Defendant has not met its burden of establishing the Report is patient safety work product. At the outset, Defendant has not met its burden of establishing the Report was reported to a PSO as required by the statute. 42 U.S.C. § 299b-21(7)(A). Initially, Defendant asserted the Report was "functionally" reported [1] to a PSO called GE-MERS, which enabled GE-MERS "to access all of [CCHHS's][2] peer reviewed material . . . while it was [CCHHS's] PSO." ECF No. 39 at 7. In response, Plaintiff pointed out that GE-MERS ceased to be a certified PSO prior to Mr. Johnson's death. ECF No. 40 at 8. Defendant then admitted its mistake, explaining that the head of Risk Management for CCHHS "misspoke" when she said that CCHHS engaged GE-MERS as its PSO at the time of Mr. Johnson's death. ECF No. 41 at 1. According to Defendant, at the time of Mr. Johnson's death, CCHHS already had ended its engagement with GE-MERS and had engaged a new PSO, University HealthSystem Consortium ("UHC"), to whom it functionally reported patient safety events. *Id.* at 2. Thus, Defendant asserts, the Report was properly reported to a CSO within the meaning of the statute.

But Defendant has offered no actual proof to support its assertion that the Report was ever reported – functionally or otherwise – to a PSO. Defendant did not, for example, submit an affidavit from anyone affiliated with CCHHS or UHC confirming the Report was made available to the PSO. There is nothing suggesting the PSO ever saw the Report or used the information contained therein in any way. CCHHS's risk manager did not even know which entity served as its PSO. All Defendant provides in support of its privilege assertion is a contractbetween

---

[1] The PSQIA permits a health care provider to "functionally" report patient safety work product to a PSO by authorizing the PSO access to specific information in the provider's patient safety evaluation system, and authority to process and analyze that information, without requiring the provider to physically transmit the information to the PSO. 73 F.R. 70732-01 at *70741 (Nov. 21, 2008).

[2] CCHS (Cook County Health and Hospitals System) is a health care system comprised of a number of hospitals and other health services centers, including Cermak Health Services, which is the entity responsible for providing medical care Jail inmates.

CCHHS and UHC stating CCHHS "acknowledges that is [sic] shall functionally report its patient safety events . . . in its Patient Safety Evaluation System . . . to UHC."[3] Defendant stops short of explicitly confirming the Report was reported to UHC, however, and instead makes the conclusory argument that the Report is patient safety work product because CCHHS "agreed to functionally report all of its patient safety events, which would include the [Report] at issue here." *Id.* Defendant essentially is asking the Court to presume, with no supporting documentation, that it (1) maintained a patient safety evaluation system, (2) made the Report part of its patient safety evaluation system, and (3) provided UHC access to its patient safety evaluation system. In other words, Defendant is asking the Court to presume Defendant complied with the PSQIA's reporting obligations by virtue of presenting the Court with a copy of a contract. That is not enough.

Even if Defendant did adequately demonstrate that the Report was functionally reported to UHC, however, the Report still would not be privileged. As set forth above, the portions of the statute relevant to this case make plain that information is privileged only if it is specifically generated or assembled for the purpose of reporting to a PSO or patient safety evaluation system. Information generated or assembled for some other purpose, even if the information relates to quality improvement measures, is not considered patient safety work product. 42 U.S.C. § 299-b21(7)(B). Defendant has not shown in any way that the Report was generated with a PSO or patient safety evaluation system in mind. To the contrary, as Plaintiff points out, the Report is an internal document prepared in accordance with Jail Policy A-10 and focused on the issue of system failures.

---

[3] In fact, the copy of the contract between CCHHS and UHC which Defendant provided to the Court is not even fully executed. The contract contains only the signature of CCHHS's representative. Where UHC's representative ought to have signed, the signature line is blank. ECF No. 41-1.

The Policy states that all morbidity and mortality reviews are conducted as part of Cermak Health Services' own patient safety and quality improvement system, explaining that the review is a "self-evaluative and self-critical analysis conducted . . . on behalf of the Quality Improvement Committee for the purpose of internal quality improvement." ECF No. 36-2 at 1. The Policy's "Review Process" explains that a "Mortality Review Committee" investigates inmate deaths, formulates recommendations for any necessary actions, prepares a Mortality Review Report, and forwards the report to the Chief Operating Officer (COO), Deputy COO, Chief Medical Officer (CMO), Quality Improvement file, and Director of Health Information Management (HIM). *Id.* at 2-3. The Director's designee then archives the original hard copy of the report "in a secured office within the HIMD, accessible only to the Director or designee." *Id.* at 3. Electronic copies of the report are scanned "in a shared folder on the network drive, accessible only to the following persons: COO, Deputy COO, CMO, Associate Medical Director, Director of HIMD, Director of Quality Improvement and Risk Manager." *Id.* After completion of the report, "[t]he CMO chair of the Mortality Committee will forward [the] report to the Director of Quality Improvement," and the "QI Committee will ensure implementation of recommended changes." Nowhere does the Policy mention the report will be provided to a PSO or a patient safety evaluation system, that the review and report are completed for the purpose of providing information to a PSO or patient safety evaluation system, or even that a PSO will have access to the report.

During oral argument on Plaintiff's Motion, Defendant maintained that a statutory construction in which a review process completed for an outside entity is privileged while a similar process completed for internal purposes is not privileged is "bizarre." Yet the text of the statute is clear on that point. 42 U.S.C. § 299-b21(7)(B). That is sufficient to end the Court's

14

inquiry. In any event, such a construction is not bizarre and, in fact, fulfills the intent of the law. *See* 73 Fed. Reg. 70732, 70742-43 (Nov. 21, 2008) ("The Patient Safety Act establishes a protected space or system that is separate, distinct, and resides alongside but does not replace other information collection activities mandated by laws, regulations, and accrediting and licensing requirements as well as voluntary reporting activities that occur for the purpose of maintaining accountability in the health care system."). PSOs are not empty entities. All PSOs must meet certain criteria, including that the mission and primary activity of the entity are aimed at improving patient safety and the quality of health care delivery, that the entity have bona fide contracts with more than one health care services provider "for the purpose of receiving and reviewing patient safety work product," and that the entity utilize patient safety work product "for the purpose of providing direct feedback and assistance to providers to effectively minimize patient risk." 42 U.S.C. § 299b-24(a)-(b)(1)(G). If a PSO fails to meet any of these or other criteria, the Secretary may revoke its PSO certification. 42 U.S.C. § 299b-24(e).

Defendant's internal quality control committee is not a PSO. It exists separately from, and need not maintain the standards required of, a PSO. There is no evidence in this case that the Report was generated or the information in the Report gathered for a PSO within the meaning of the PSQIA. That ends the inquiry for all practical purposes under the statute. Further, there is no evidence that the Report, if it were covered by the PSQIA, actually was provided to a PSO or was functionally reported to a PSO within the meaning of the PSQIA. Even if Defendant could show that the Report was functionally reported to a PSO because the PSO had access to it (which it has not yet done), however, Defendant cannot simply make an internal report that otherwise is not privileged under the PSQIA functionally available to a PSO and then assert it is privileged under the PSQIA. If that were sufficient, similarly situated defendants could insulate large

15

swaths of otherwise discoverable internal documents with the talismanic incantation that the information was theoretically available to a PSO. That does comply with the intent or spirit of the statute. In the final analysis, Defendant contends that it has met its burden of showing the PSQIA applies to the Report by presenting the Court with evidence that it has a paper relationship with a PSO, based on a paper not even signed by the PSO. That is not enough to invoke the privilege against production provided by the PSQIA. For all of the reasons discussed above, the Report cannot be considered patient safety work product and therefore is not privileged under the PSQIA.

## CONCLUSION

Accordingly, for the reasons set forth above, Plaintiff's Motion to Compel (ECF No. 36) is granted. It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated: August 31, 2015